## Case No. 7,422.

In re JOHNSTON.

[See Case No. 7,421.]

## Case No. 7,423.

In re JOHNSTON.

[14 N. B. R. 569.] [1]

Circuit Court. N. D. Illinois. Nov., 1876.

[1] [Reprinted by permission.]

## Case No. 7,424.

In re JOHNSTON.

[25 Pittsb. Leg. J. 141.]

District Court. W. D. Pennsylvania. Jan. 29, 1878.

By SAMUEL HARPER, Register:

To the Honorable Winthrop W. Ketcham, Judge of Said Court:

When the petition for adjudication in bankruptcy against James H. Johnston was filed, his personal property was under levy by virtue of an execution issued on a judgment in favor of Joseph C. Grubb & Co., for the real debt of $20,000. Proceedings under the execution were enjoined, and after the appointment of an assignee, he was allowed, by order of court, to sell the personal property at private sale. The sale having been completed, he filed his account in court, which was referred to me to ascertain and liquidate the liens against the fund and prepare a schedule of distribution. The only lien against it is that of Joseph C. Grubb & Co., above referred to. Two questions arise on

this alleged lien: First, that the creditor is only entitled, if entitled to anything, to the first instalment falling due under the terms of the bond; and, second, that under the circumstances of the case the levy was a fraudulent preference under the bankrupt law, and therefore void.

On the 16th of December, 1874, an agreement under seal was executed between Joseph C. Grubb & Co. and the bankrupt, with a preamble showing that the bankrupt was indebted to Grubb & Co. on several promissory notes, and had given them his bond for $20,000, to secure the payment of which he had executed a mortgage upon certain property in Allegheny county and assigned a policy of insurance upon his life, issued by the Connecticut Mutual Life Insurance Company, by which agreement Grubb & Co. agreed to continue to sell goods to the bankrupt from time to time for the period of two years, to an amount not exceeding $20,000; the securities to cover any indebtedness arising out of any subsequent transactions connected with the subject of the agreement. The bankrupt on his part agreed to conform to the terms specified in the agreement governing such sales, that he would not sell or assign any of the property embraced in the securities except in the ordinary way of his trade; that he would not permit any judgments to be recovered or suits to be brought against him except in contested cases. Grubb & Co. further agreed that so long as the bankrupt performed his covenants they would not issue scire facias on the mortgage, enter judgment on the bond or issue execution, but reserving the right upon Johnston's default for thirty days to pay any one of said notes, to consider the bond and mortgage due and payable forthwith, and to proceed to collection; but in such case "said James H. Johnston may at any time before sale, on payment of the notes then due, and on payment of the costs, have said writ stayed, and said Joseph C. Grubb & Co. agree to stay said writ on such payment."

Some time afterwards Johnston became so embarrassed that he applied to his creditors for an extension. An agreement having that for its object was prepared, under date of September 13, 1875, and was signed by many of his creditors. It provided for a four years' extension, four notes to be given to each creditor—one for fifteen per cent., payable in one year; one for twenty-five per cent., payable in two years; one for twenty-five per cent., payable in three years; and one for thirty-five per cent., payable in four years,—and all without interest. It further provided, that in case of failure to obtain the signatures of ninety per cent. of the business creditors by October 1, 1875, the agreement should become void. One clause I quote at length: "And it is further agreed that this agreement, and the receipt by creditors of notes under the same, shall not disturb or in any way affect any securities that the creditors

may have for their claims, except to postpone their remedies upon the said securities until default is made by the said James H. Johnston in the payment of the notes given by him as aforesaid." This extension agreement was signed by Joseph C. Grubb & Co., but they attached to their signature this note: "For our debt of $20,000, secured by bond and mortgage, reserving all our rights under said bond and mortgage, and agreeing only to issue no writ of execution or of scire facias thereon until default be made in payment of one of the notes given under this extension." Whether this note in any manner varied the terms of the agreement or not, it was known to all the creditors, as Grubb & Co. appear as the first signers of the extension. Grubb & Co. entered their bond in judgment on the 5th day of September, 1876, and issued the execution on which the levy enjoined was made. At that time the bankrupt was indebted to them about $24,000. The notes given to the creditors under the extension agreement were dated September 1, 1875, and the first one had a year to run. It will be recollected that, under the original agreement between the bankrupt and Grubb & Co., the latter were at liberty to proceed upon their securities after thirty days in the bankrupt's default to pay any one of the notes they might hold. In the extension agreement it was expressly provided that the securities held by the creditors should not be disturbed or in any way affected, "except to postpone their remedies upon the said securities until default is made by the said James H. Johnston in the payment of the notes given by him as aforesaid." And to emphasize this point, Grubb & Co., in signing the extension agreement, added to their signature a note reserving all their "rights under the bond and mortgage, and agreeing only to issue no writ of execution or of scire facias thereon until default be made in payment of one of the notes given under this extension." The first note given under the extension fell due September 4th, 1876, and default was made by the bankrupt in its payment, and under the provisions of all the agreements Grubb & Co. had a perfect right to enter judgment and issue execution on September 5th, as they did. But now it is contended that Grubb & Co. are only entitled to payment of so much of their claim as was actually due at that date, because Johnston had a right to pay the amount then due before sale, and Grubb & Co. were bound on such payment to stay the writ. It is a sufficient answer to this to say that Johnston did not pay what was then due,—that is, the first of the extension notes,—nor did he offer to pay it. Such a claim can no more be made now than it could have been made by Johnston himself had no bankruptcy proceedings been had, and his property had been sold and an auditor appointed to make distribution. However, if there were any foundation for this claim, it could not be suc-

-cessfully maintained. The debt owing to Grubb & Co. was all due on the 5th of September. Grubb & Co. retained all of their rights under the bond and mortgage, and merely agreed that they would not issue process to collect until default in the payment of any one of the extension notes. One of their rights was to issue after a default of thirty days to pay one of the original notes, and to consider the whole indebtedness due. During the year following the extension agreement, all of the original notes became due by the expiration of the time they had to run, and the right of Grubb & Co. to issue execution was only qualified by the bankrupt's prompt payment of his extension notes. The provision that the bankrupt might obtain stay of the writ related only to the original notes actually due, and not to the extension notes. Even had Johnston tendered payment of the first extension note before sale, he was not entitled to a stay of the writ. In no view of the case can the execution and levy of Grubb & Co. be limited to the amount of the first extension note. I understand the assignee as claiming that the lien of the levy can only extend to such of the original notes as may have been due on the 5th of September, 1876, each one of them having been extended by the extension agreement. I cannot concur in that view. The proper construction to be placed upon the several papers in evidence is that Grubb & Co. reserved all rights belonging to them before the extension agreement was executed, and merely suspended their right to enforce collection until the bankrupt defaulted in his extension notes, and when such default took place the extension agreement as to them became wholly void and inoperative, and their rights and those of the bankrupt must now be determined as though that agreement never had an existence. It follows from this that their entire claim against the bankrupt, under the bond, having been more than thirty days over-due, their proceedings to collect it were fully authorized by the agreements between them, and neither the bankrupt nor his assignee could rightfully claim a stay of proceedings without the payment of the entire claim. This disposes of the first question.

The second question is more easily answered, as I do not find in the evidence a single fact or allegation that justifies me in discussing it. Upon the part of Grubb & Co. a very different question is raised and very earnestly urged. A deputy sheriff of Allegheny county was called. and testified that had the sheriff sold on his writ without delay and realized $14,000. the costs would have been $206.95, not including attorney's commissions. The point is made that out of the gross sum realized by the assignee no more costs can be deducted than would have been incurred by a sheriff's sale. There is no sound reason alleged why this point should be sustained. and I can see none. It does

not appear, nor is it even alleged, that the sheriff could have realized $14,000 out of the property; could that be made to appear, the point would have more in it. Sheriff's sales are forced public sales to the highest bidder. At such sales it is notorious that but few persons are present, owing to the very limited notice a sheriff is required by law to give. In this matter, however, the court by its order authorized the assignee to sell the goods at private sale. Of course, such an order would not have been made had not the court been satisfied that a much larger amount would be realized than by a forced public sale. A private sale involves heavier expenses for rent, clerks, advertising, circulars and many other purposes; and such expenses must of course be paid. It would not be just to charge the general fund, if there were one with them, and allow the greatly increased amount realized to go in full to the secured creditor. The universal rule is that every fund must be charged with the expenses properly incurred in producing it. In this matter there is no exception to any particular item charged by the assignee as expenses, and I am at liberty to consider them as proper. and the amounts as reasonable. I have of course examined the account carefully; and while there was no testimony given to explain the reason for every item, I could not fail to observe that the principal expenditures were for rent and clerk hire; and that of the rent, $2,373.19 was paid under an order of court, and included rent due at the time Grubb & Co.'s execution was issued, and would consequently be paid in preference to the execution creditor. But I consider this point settled by the order of court authorizing the private sales. In making the order, the court was undoubtedly governed by the fact, that a larger sum would be realized by such a sale, or no such order would have been made. I do not know, nor does it alter the question whether the order was made by the consent or in opposition to the wishes of the creditors. If made with their consent, of course it does not stand in their mouths now to object to the expenses; and if made in opposition to their wishes, they had their remedy by a bill of review to the circuit court. As long as the assignee acted in accordance with the order of court,—and of that there is no question,—the creditors are bound by his expenditures, unless they are improper and unreasonable. They enjoy the advantage of the increased results, and cannot avoid bearing the increased expenses. It would be inequitable and unjust to allow them all the advantages and compel the general fund to pay the expenses fairly incurred in realizing them.

A more difficult question yet remains to be considered. The assignee's account shows that his gross receipts at private sale amounted to $9,840.78, and his expenditures to $4,298.98, leaving a balance of $5,541.80, to

which he adds the proceeds of his public sale, $3,653.79, making a total of $9,195.59. He claims credit for his commissions and compensation $562.54, leaving in his hand a balance of $8,633.05. This is the result of the sales at the bankrupt's place of business. The account also shows that he received from the sale of goods in the United States bonded warehouse $1,089.90, and two other items of property, $25.00, making a total of $1,114.90. He claims credit for his commissions and compensation $12.34, leaving a balance of $1,102.56. Grubb & Co. contended that their execution was a lien upon the goods in the bonded warehouse as fully as upon the goods in the bankrupt's store. The assignee resists this position, and claims that, as the goods were in the possession of the United States, they were not subject to the lien of this execution. It is true that a sheriff may levy upon and sell the interest of a debtor in personal property, though the immediate·possession and the right to it be ·in another. Srodes v. Caven, 3 Watts, 258; Welsh v. Bell, 32 Pa. St. 12; Meyers v. Prentzell, 33 Pa. St. 483. Where the United States marshal has levied on the defendant's goods to an amount more than sufficient to pay the executions in his hands, an execution will bind the surplus in the hands of the marshal. Bayard v. Bayard [Case No. 1,129]. These are the authorities cited to support the claim, but they do not reach the vital question involved. This is a case in which the sovereign had the custody of the goods and until the actual payment of the duties, even the bankrupt himself could not claim their delivery to him. The authorities first cited refer to persons, and not to the sovereign, who is not bound even by legislative acts, unless specially named. In the last authority cited, the reason of the decision is apparent. The marshal had levied and sold under one writ, and realized a balance after paying the debt and costs, and subsequently a second writ against the same defendant was placed in his hands; but between the first and second writ an execution against the same defendant was placed in the hands of the sheriff of the county. The contest was ·between the two execution creditors, and the right of the sheriff to the fund was recognized on the ground that the marshal was justified in levying upon so much property only as would satisfy the writ. and that the balance remaining in his hands was not properly in his possession, but belonged to the debtor. and was subject to the writ in the sheriff's hands. The United States marshal, however, is not the United States, and his custody of that fund was not the custody of the United States. In this case. on the contrary. the custody of the revenue officer is that of the United States.

I have not been able. after a very diligent search, to find any authority upon the express point raised. but Harris v. Dennie. 3 Pet. [28 U. S.] 292. seems to me sufficiently clear to decide it. Dennie, deputy sheriff of Suffolk county, Mass.. attached twenty-three cases of silk for a debt due by importers and owners, he offering at the time to give security to the collector for the payment of the duties. Seventeen days afterwards, the goods being in the customhouse stores, the storekeeper executed an agreement, in which he said: "I hold the above-described twenty-three cases of silk subject to the order of James Dennie, Esq., deputy sheriff." Harris was the United States marshal for the district,. and attached and took the goods on several writs in favor of the United States, founded on bonds given by the owners, amounting to a sum much larger than the value of the merchandise on which duties were due and unpaid when the goods arrived. Dennie brought trover against Harris. In the opinion of the court it was said: "The other point is one of far more importance, and in our opinion, deserves a serious consideration. If, consistently with the laws of the United States, goods, in the predicament of the present, were not liable to any attachment by a state officer, it is very clear that the present suit could not be sustained, and that judgment ought to have been given upon the special verdict in favor of the original defendant. And in our opinion, these goods were not liable to such an attachment. In examining the revenue collection act of 1799, c. 128 [1 Story's Laws, 573, 1 Stat. 627, c. 22], it will be found that numerous provisions have been solicitously introduced, in order to prevent any unlivery, or removal of any goods imported from any foreign port in any vessel arriving in the United States, until after a permit shall have been obtained, from the proper officer of the customs for that purpose. These provisions not only apply to vessels which have already arrived in port, but to those which are within four leagues of the coast of the United States. The sections of the act from the twenty-seventh to the fifty-eighth are in a great measure addressed to this subject. From the moment of their arrival in port, the goods are, in legal contemplation, in the custody of the United States; and every proceeding which interferes with, or obstructs or controls that custody, is a virtual violation of the provisions of the act. Now, an attachment of such goods by a state officer presupposes a right to take the possession and custody of those goods, and to make such possession and custody exclusive. If the officer attaches upon a mesne process, he has a right to hold the possession to answer the exigencies of the process. If he attaches upon an execution, he is bound to sell or may sell the goods within a limited period, and thus virtually displace the custody of the United States. The act of congress recognizes no such authority. and admits of no such exercise of right. No person but the owner or consignee or, in his absence or sickness, his agent or factor in his name. is entitled to enter the goods at the customhouse, or give bond for

the duties, or pay the duties. Sections 36, 62. Upon the entry, the original invoices are to be produced and sworn to; and the whole objects of the act would be defeated by allowing a mere stranger to make the entry, or take the oath prescribed on the entry. The sheriff is in no just or legal sense the owner or consignee (and he must, to have the benefit of the act, be the original consignee); or the agent or factor of the owner or consignee. He is a mere stranger acting in invitum. He cannot then enter the goods, or claim a right to pay the duties, or procure a permit to unlade them; for such permit is allowed in favor only of the party making the entry, and paying or giving bond for the duties. Sections 49, 50. If, within the number of days allowed by law for unlading the cargo, the duties are not paid or secured, the goods are required to be placed in the government stores, under the custody and possession of the government officers. And at the expiration of nine months, the goods so stored are to be sold, if the duties thereon have not been previously paid or secured. Section 56.

The only difference between that and the case in hand is, that in this it is attempted to bind the interest of Johnston in the goods after the payment of the duties; but the difference is more apparent than real, for in that case the deputy sheriff tendered security for the payment of the duties, and if the payment of the duties was all the United States had a right to demand, it would seem that the sheriff was entitled to the possession of the goods. But there was something more required. The owner and consignee, or his agent and factor, in his name and for him, was and still is required by the law to make the entry, give bond or pay the duties. No one else can do it. It was there expressly decided that the sheriff could not do it, being a stranger, acting in invitum. If that be so, how could the sheriff's vendee do it? If the sheriff in this case had been allowed to proceed and had sold the bankrupt's interest in these goods, what would the purchaser have taken? As he would not be allowed to give a bond or pay the duties, he certainly would not have been able to obtain possession.

It would not be difficult to assign reasons why the claim contended for should not be allowed. Were it true that a vendee at such a sale would be entitled to pay the duties and obtain possession of the goods, it is apparent that the United States would be put to the annoyance and oftentimes perplexity of ascertaining the identity not only of the consignee but also of the vendee, and that the person whose interest was sold was in point of fact the owner of the goods. Certainly such a result cannot be permitted. Again, if the goods were sold by the United States for the payment of duties, how could the sheriff's vendee compel the payment to him of the balance realized by the sale? The United States cannot be made a garnishee, and as an execution attachment would not lie, I am unable to see how, in any manner, the goods or the owner's interest in them can be realized by an execution. Without further elaboration of the subject, I conclude that the goods in the government warehouse were not bound by the lien of the execution of Grubb & Co.

From the report attached to the assignee's account, it appears that Alexander King, the owner of the building occupied by the bankrupt, claims the sum of $270.83 for rent for the month of March, 1877. No formal claim has been presented by Mr. King, nor has a formal appearance been entered on his behalf, although his counsel called at my office in reference to the matter. I deem it proper, however, to pass upon the claim as though formally presented. The assignee is allowed to retain possession of the premises occupied by the bankrupt, for a reasonable time for the purpose of disposing of the assets, and it is the practice in this district to allow compensation to the owner in the nature of storage, rather than as rent. There must be more than that to amount to an acceptance of the lease by the assignee, and nothing more has been alleged here. The owner has been paid in full for all the time the assignee retained possession of the premises, at the full rate of the lease; the account showing that $2,914.86 has been paid to him. In no case within my knowledge has the landlord been allowed his rent for any time beyond that in which the assignee retained possession of the premises. I cannot, therefore, make any appropriation to the claim.